## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

**JESSE HOOKS,**

                                 **PLAINTIFF,**

**v.      NO. 2:2024-cv-00209**

**LIFTED LIQUIDS, INC. D/B/A LIFTED LIQUIDS, URB CANNABIS,
BARRY HOLLINGSWORTH, CHIEF FINANCIAL OFFICER;
GERARD M. JACOBS, SECRETARY;
NICHOLAS S. WARRENDER, CHIEF EXECUTIVE OFFICER;
VANDO HOLD LTD,
MC NUTRACEUTICALS,
AND JOHN DOES 1-100,**

                                   **DEFENDANTS.**

## AMENDED COMPLAINT

COMES NOW, Plaintiff, **JESSE HOOKS,** by and through counsel, Sutter and Gilham, PLLC; and, for this Amended Complaint, Plaintiff alleges the following upon information and belief, except for the allegations pertaining specifically to Plaintiff, which are based on personal knowledge:

## INTRODUCTION

Plaintiff, **Jesse Hooks**, is a resident of the State of Arkansas who purchased delta-8 ("D8") vape pens and concentrates (the "Products"), which were manufactured, distributed, and/or sold by Defendant(s) for re-sale, then he was arrested and convicted of a crime, causing him lost profits and wages, as well as loss of the business he owned, which sold the Products. The Controlled Substances Act

of 1970 prohibits the manufacturing, distribution, and sale of cannabis products with a delta-9 ("D9") tetrahydrocannabinol ("THC") concentration of more than 0.3 percent on a dry weight basis.

Plaintiff, **Jesse Hooks**, unknowingly purchased Products manufactured, distributed, tested, and/or sold by Defendant(s) that contained a concentration of more than 0.3 percent on a dry weight basis of D9 THC. Plaintiff intended to purchase the Products labeled as D8 vape pens and concentrates but was unlawfully sold vape pens and concentrates containing illegal amounts of D9.

## JURISDICTION AND VENUE

1.      Subject Matter Jurisdiction is proper under 28 USC 133, 18 U.S.C. § 1964(c), 28 U.S.C. § 1332(d)(2) and 28 USC 1331, as well as 28 USC 1367.

2.      The aggregate amount in controversy exceeds $50 million, including any statutory damages, exclusive of interest and costs.

3.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district. More specifically, Defendants manufactured, distributed, and/or sold the Products in this district, and the actions giving rise to the claims occurred within this district.

4.      Plaintiff purchased the Products from the Defendants for re-sale in the last four years.

## PARTIES

5.      Plaintiff, **Jesse Hooks**, is a resident of the State of Arkansas, who purchased D8 products from **Vando Hold LTD** (the Distribution Defendant hereinafter) over the following website, Buy Delta 8 THC Online - Top Brands - Delta 8 Resellers.

6.      **LIFTED LIQUIDS, INC. d/b/a LIFTED LIQUIDS** has a primary business address in Kenosha, Wisconsin, and advertises an Illinois hemp license #1204-291. Defendant, **Lifted Liquids**, has corporate filings in the following states: CA, CO, FL, GA, IL, IN, KY, LA, MD, MN, MS, NJ, NC, OH, TX, VA, VT, and may be registered in other states. **Lifted Liquids, Inc.** has the following corporate officers listed: Barry Hollingsworth, Chief Financial Officer; Gerard M. Jacobs, Secretary; and Nicholas S. Warrender, Chief Executive Officer. Lifted Liquids' Registered Agent is Corporate Creations Network Inc., located at 4640 Admiralty Way FL5, Marina Del Rey, CA 90292. John Does 31-40 are individuals who have provided credit or other financing to **Lifted Made** or have provided **Lifted Made** with distillate. John Doe 11 is its ISO. **Lifted Made d/b/a Lifted Liquids** is the parent company of **URB CANNABIS**. These are the Lifted Made Defendants hereafter.

7.      **JOHN DOES 1-10 (hereinafter the Lab Defendants)** are entities who contracted with Lifted Made or MC Nutraceuticals to test the Products Plaintiff

purchased. MC Nutraceuticals (MC hereinafter) specializes in the wholesale distribution of cannabinoid products, including a variety of minor cannabinoids. The company offers third-party tested cannabinoid products such as isolates and distillates. MC also provides services like custom formulations and white-label manufacturing to meet the diverse needs of businesses in the cannabinoid market. It was founded in 2020 and is based in Flower Mound, Texas. Distillate makers like MC are sued as John Does 100-120. Distillate makers, sued as John Does, and MC extract and refine cannabis to create different raw materials, such as distillate, for formulation by Manufacturer Defendants. MC and these distillate makers know that the distillate contains an illegal amount of D9 THC by virtue of the manufacturing process. MC and these distillate makers and the manufacturers know that further processing such as the Pegasus process is necessary to remove the excess D9 THC from the distillate. But these processes dramatically increase the costs such that the manufacturers have decided not to spend the money necessary to create a compliant D8 vape pen in order to increase their profits, even though Defendants know consumers like the Plaintiff will be mislead. **JOHN DOES 12-30 (hereinafter the Distillate Defendants)** are entities like MC who provided Lifted Made with distillate, and other ingredients to manufacture the Products Plaintiff purchased. The **Distillate Defendants** may also create Products as white labelers.

## <u>GENERAL ALLEGATIONS OF FACT</u>

**Plaintiff has been damaged.**

8.     Plaintiff owned a retail establishment in Arkansas, which sold hemp products and glass products.

9.     Plaintiff **Jesse Hooks** purchased thousands of dollars of products manufactured by **Lifted Made,** or at **Lifted Mades** direction, and distributed by Vando Hold LTD in reliance upon the lab reports issued by the Lab Defendants and published by Lifted Made to induce Plaintiff to purchase the Products**.** These products were falsely certified as compliant by the Lab Defendants. But, as alleged below, the products were not compliant.  So, Plaintiff unknowingly bought illegal products.

10.     Local law enforcement raided Plaintiff's store and seized the merchandise Plaintiff had purchased that was manufactured and, or sold by Lifted Made.

11.     Plaintiff was also arrested and charged with Possession of a Controlled Substance and Possession of a Controlled Substance with Intent to Deliver, which caused him severe mental, emotion, and physical distress.

12.     Plaintiff's inventory was seized, and his business was closed, resulting in lost profit.

**13.** Plaintiff was convicted of Possession of a Controlled Substance based on his possession of the products manufactured and/or sold to him by the Defendants.

**14.** Plaintiff purchased the products: Urb – Cupcake Kush TCHO, Urb – Zenergy Uplift, and Urb – Crumble from Vando.

**15.** The Products were manufactured by Defendant, **Lifted Made.**

**16.** The Products were distributed by Defendant, Vando Hold LTD.

## The 2018 Farm Bill

**17.** On December 20, 2018, President Trump signed into law the Agriculture Improvement Act of 2018, Pub. L. 115-334 (2018 Farm Bill). The 2018 Farm Bill legalized hemp production for all purposes within the parameters laid out in the statute. As defined in the 2018 Farm Bill, the term "hemp" means the plant species Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. Delta-9 tetrahydrocannabinol, or THC, is the primary intoxicating component of cannabis. Cannabis with a THC level exceeding 0.3 percent is considered marijuana, which remains classified as a Schedule I controlled substance regulated by the Drug Enforcement Administration (DEA) under the Controlled Substances Act (CSA.)

18. D9 THC is the psychoactive component of what is commonly known as marijuana.

19. D8 THC is also psychoactive, but D8 THC is hemp-derived and is not a controlled substance under federal law. If D8 THC is produced, D9 THC is also produced.

20. Hemp-derived D9 THC can be present in a product so long as the amount does not exceed 0.3% D9 THC by dry weight. Here, all of the products Plaintiff purchased, including products marketed by the Distribution Defendant, contain an illegal amount of D9 THC.

21. MC and the John Does extract and refine cannabis to create different raw materials, such as distillate, for formulation by Lifted Made. Cannabinoid distillation is a sophisticated process within the realm of cannabis extraction and refinement. It involves the creation, separation and purification of cannabinoids, which are the active compounds found in the cannabis plant, such as THC (tetrahydrocannabinol). Through cannabinoid distillation, producers can isolate specific cannabinoids for various purposes, such as medical treatments, recreational products, or research applications. When D8 THC is produced in sufficient concentration to be psychoactive, an illegal amount of D9 is also produced.

22. Distillate makers sued as John Does and MC extract and refine cannabis to create different raw materials, such as distillate, for formulation by Lifted Made.

MC and these distillate makers know that the distillate contains an illegal amount of D9 THC by virtue of the manufacturing process. MC and these distillate makers and the manufacturers know that further processing such as the Pegasus process is necessary to remove the excess D9 THC from the distillate. But these processes dramatically increase the costs such that the manufacturers have decided not to spend the money necessary to create a compliant D8 vape pen in order to increase their profits, even though they know consumers like the Plaintiff and others will be mislead.

23.    Cannabinoid distillate typically contains high levels of cannabinoids and minimal amounts of other plant compounds, such as terpenes and flavonoids, making it a versatile ingredient for various cannabis products. Lifted Made commonly uses the distillate in the manufacturing of edibles, vape cartridges, concentrates, topicals, tinctures, and other cannabis-infused products due to its consistent potency and customizable cannabinoid profiles.

**THE DISTILLATE MAKERS CONTROL THE THC LEVELS**

24.    MC and distillate makers sued as John Does extract and refine cannabis to create different raw materials, such as distillate, for formulation by Lifted Made. Cannabinoid distillation is a sophisticated process within the realm of cannabis extraction and refinement. It involves the creation, separation and purification of cannabinoids, which are the active compounds found in the cannabis plant, such as

THC (tetrahydrocannabinol). Through cannabinoid distillation, producers can isolate specific cannabinoids for various purposes, such as medical treatments, recreational products, or research applications. When D8 THC is produced in sufficient concentration to be psychoactive, an illegal amount of D9 is also always produced.

25. Thus, MC and these distillate makers know that the distillate contains an illegal amount of D9 THC by virtue of the manufacturing process. MC and these distillate makers and the manufacturers know that further processing such as the Pegasus process is necessary to remove the excess D9 THC from the distillate. But these processes dramatically increase the costs such that the manufacturers have decided not to spend the money necessary to create a compliant D8 vape pen or other Prodcut in order to increase their profits, even though they know consumers like the Plaintiff and others will be misled.

26. Cannabinoid distillate typically contains high levels of cannabinoids and minimal amounts of other plant compounds, such as terpenes and flavonoids, making it a versatile ingredient for various cannabis products. Lifted Made commonly uses the distillate in the manufacturing of edibles, vape cartridges, concentrates, topicals, tinctures, and other cannabis-infused products due to its consistent potency and customizable cannabinoid profiles.

27.  LIFTED could have accurately tested the cannabinoid levels of their product in-house, and specifically the D9 levels, but they chose not to.

## THE LABS ARE AN INDISPENSABLE PART OF THE ENTERPRISE

28.  Each one of the Products listed above was accompanied by a COA claiming the product contains no more than 0.3% hemp-derived D9 THC by weight as allowed by law. The amount of D9 reported on the inaccurate COAs issued by the Lab Defendants, including Marin Analytics, are far below tested results from an independent third-party laboratory.

29.  The Lab Defendants that were chosen by Lifted Made were a vendor of choice. Lifted Made could have procured the services of an accurate and reputable lab for Product testing but intentionally decided not to do so.

30.  Plaintiff had all of Lifted Made's vape Products and the concentrate he purchased tested by an independent third-party laboratory that Lifted Made currently uses for some of its non-vape products. The results from all products for the D9 THC are far above what is allowed by law.

## Plaintiff unknowingly purchased a Controlled Substance

31.  Plaintiff purchased these Products anticipating and expecting them to be legal D8 THC products because the Products were warranted to contain no more than .3% D9 THC by dry weight.

32.     Plaintiff wanted a legal amount of hemp-derived delta-9 tetrahydrocannabinol (hereinafter "hemp-derived D9 THC").    Plaintiff did not purchase a product containing a legal amount of Delta 9 Tetrahydrocannabinol because of each Defendant's deception.

33.     Unbeknownst to Plaintiff, the Products labeled as "D8" contained an illegal amount of D9 THC and an understated amount of D8 THC.

34.     Plaintiff purchased numerous Products sold by Defendants, to sell to the public through his business. In doing so, Plaintiff relied upon the COAs placed upon the Products by Defendants indicating that the Products had been tested and were in compliance with federal law.

35.     **Lifted Made d/b/a Lifted Liquids** were and are knowingly falsifying information on their product containers, misleading consumers with false COA information, and colluding with laboratories to obtain D9 results that falsify the accurate amount of the D9 cannabinoid that is in their products.

36.     **Lifted Made d/b/a Lifted Liquids,** warrants that these D8 THC Vape Pens and concentrates, on the label and through fraudulent certificates of analysis, are compliant with the Hemp Farming Act of 2018, meaning that these products are to contain no more than 0.3% hemp-derived D9 THC by weight.  This representation is false because the Products contained more than 0.3% hemp-derived D9 THC by weight and understated the amount of D8 THC.

**37.** Each Defendant intends for Plaintiff to rely upon these false representations because Defendant also warrants and represents through its website:

> "We know that having certified, third party lab results is what's important for you to trust your favorite hemp-derived products. That's why we send every product we make for testing of various things."
> https://urb.shop/lab-results/

**38.** The representations made by Defendants are misleading because the product label and the COAs warrant that each Product contains a legal amount of hemp-derived D9 THC even though it does not.

**39.** The Products are manufactured, distributed, or sold individually by each Defendant, and each Defendant has continuously manufactured, distributed, and/or sold illegal products for over a year, according to product testing results.

**40.** Plaintiff relied on the representations on the label that the products Plaintiff bought contained a legal amount or type of Delta 9 Tetrahydrocannabinol.

**41.** Plaintiff would not have purchased any of the Products if Plaintiff knew that the representations that the Products purchased contained a legal amount of hemp-derived Delta 9 Tetrahydrocannabinol on the label were false and misleading.

**42.** Plaintiff chose the Products over similarly situated and represented products that contained a legal amount and type of Delta 9 Tetrahydrocannabinol.

**43.** The Products were illegal and worthless because the Products did not contain a legal amount of Delta 9 Tetrahydrocannabinol and contained an

understated amount of D8 THC as well, and no business owner who wished to remain in business would have purchased Products absent Defendants' false and misleading statements and omissions.

44.     Plaintiff intends to, seeks to, and will purchase D8 products again if and when Plaintiff can do so with the assurance that Product representations that the product contains a legal amount and type of Delta 9 Tetrahydrocannabinol are legal and truthful.

45.     As used in this Complaint, an illegal D8 THC vape or concentrate means a vape that contains more than 0.3% D9 THC hemp-derived THC by weight or understated amount of D8 THC.

46.     Each of the Products had a COA, and these COAs did not reveal that these products contained more than .3% d9 THC by dry weight.

47.     Each of these products had conspicuous wording on the packaging that stated that the Product had no more than .3% D9 THC and was Farm Bill compliant.

48.     **Lifted Made d/b/a Lifted Liquids** is the parent company of Urb Cannabis.

49.     Each of the Products was tested by *Infinite Chemical Analysis*, which was indicated to have a specific amount of THC.  The testing also revealed the presence of understated amount of D8 THC in each product.  The testing of the

Products which occurred on or about November 3rd, 2023 showed the following retested hemp-derived D9 variance levels:

a. Urb Cannabis, vape, with a strain name of Cupcake Cush THCO; ReTest D9 THC 6.96%, with D9% variance of 2220%, above the legal limit;

b. Urb Cannabis, vape, with a strain name of Zenergy Uplift; ReTest D9 THC 5.82%, with D9% variance of 1840%, above the legal limit;

c. Urb Cannabis, vape, with a strain name of Crumble; ReTest D9 THC 0.992%, with D9% variance of 230.67%, above the legal limit;

d. Urb Cannabis, gummies, with a strain name of Lemon Gummies; ReTest D9 THC 0.325%, with D9% variance of 8.33%, above the legal limit;

### **This is an illegal practice well known to the Defendants**

50.     Like here, the *Journal of the American Medical Association* published a letter demonstrating the results of "undercover" purchases of CBD. Of 84 samples tested, THC was detected in 21%. There were other defects in the mislabeled products. Only 30.95% were accurately labeled. Accuracy of labeling depended on product type, with vaporization liquid most frequently mislabeled (87.50%) and oil most frequently labeled accurately (45.0%). THC was detected (up to 6.43 mg/mL) in 18 of the 84 samples tested (21.43%). Here, Defendants appear to certify and sell products that contain up to 2,220% above the allowed limit of 0.3% D9 THC by dry weight. Defendants knew or should have known that their products had been

mislabeled with inaccurate information. Defendants could have reliably tested their own Products in-house before or after the products were sent to a laboratory and before they sold them.

51.     A study published by the National Institute of Health showed that products were mislabeled, with 26% containing less CBD than labeled and 43% containing more, indicating a high degree of variability and poor standardization of online products. Notably, the oil-based products were more likely to be accurate (45% compared to 25% for tincture and 12.5% for vaporization liquid) and had a smaller percentage of deviation. Oil-based products also had a higher range of concentration. In addition to CBD mislabeling, THC was detected in 21% of samples. This study also notes that products containing THC could have sufficient enough concentrations to produce intoxication in children.

52.     Of course, in recent years, the United States Department of Justice has largely declined to bring prosecutions under the federal cannabis laws, prompting hundreds of millions of investment dollars and thousands of new customers to flow into the D8 THC commercial hemp industry.

53.     But the Justice Department's current policy of non-enforcement does not strike a single word from the U.S. Code or deprive private individuals of their judicially- enforceable rights under federal law. The Department of Justice can no

more amend a federal statute than can any individual state and cannabis remains just as illegal under federal law today as it was when Congress passed the CSA.

54.     Dealing in cannabis that contains more than 0.3% D9 THC by weight is an illegal activity under state and federal law, and those who engage in a pattern of unlawful activity should disgorge the profits and all monies received from the illegal transactions.

55.     The manufacturing, distribution, and sale of Products with more than 0.3% D9 THC by dry weight is illegal.  Plaintiff purchased the Products, set out hereinabove, that contained more than 0.3% D9 THC by weight.  Defendants falsely, expressly, or impliedly, warranted these products to contain no more than 0.3% D9 THC by dry weight.

56.     Reasonable consumers, like Plaintiff, rely on a company to honestly identify and describe the Product's components, attributes, and features relative to itself and other comparable products or alternatives.

57.     The Products that Plaintiff purchased were worth zero because the Products were illegal.  Unknowingly, Plaintiff paid the full price for noncompliant and illegal products.

58.     Defendants sold the Products at higher prices than they would have in the absence of this misconduct, resulting in additional and illegal profits at the expense of consumers.

**59.** Had Plaintiff known the truth, they would not have bought the Products because they are illegal.

**60.** Each Product is sold for a premium price compared to other similar products, a higher price than it would otherwise be sold for, absent the misleading representations that the Product was legal.

**61.** Indeed, the individual Defendants knew that the product contained more than .3% D9 THC by dry weight because they specifically hired a lab that agreed to understate the amount of D9 THC in the product or report that the D9 could not be detected or isolated.

**62.** The individual Defendants were aware that other labs had tested their D8 vape pen products and reported that the D8 vape pens contained more .3% D9 THC by dry weight.

## NON-RICO COUNTS

## COUNT I – FRAUDULENT REPRESENTATIONS

**63.** Plaintiff incorporates by reference all preceding paragraphs against Defendants.

**64.** Plaintiff and others desired to purchase a legal product that contained hemp-derived D8 THC, understood as being comprised of a non-de minimis legal amount of D9 THC; instead, the Products contain an illegal amount of hemp-derived

D9 THC or synthetic D9. Honest testing can, and has, differentiated between hemp-derived Delta 9 THC or understated the amount of D8 THC.

65.    Each Defendant who manufactured, tested, or sold these Products, has made false and misleading advertising claims purporting to be based on factual, objective evidence in the form of scientific test results, compared the Product's effectiveness or safety to that of other brands or products, and purported to be based on facts.

66.    In conspiracy with the other, Defendant made false and misleading claims regarding the Product through statements, omissions, ambiguities, half-truths, and/or actions that the product contained more than 0.3% D9 THC by weight and contained less than the amount of advertised D8 THC.

67.    Plaintiff claims Defendants violated Wis. Stat. Ann. § 100.18(1). With the intent to induce an obligation, the defendant made a representation to "the public" that the product contained less than 0.3% D9 THC by dry weight and contained less than the amount of D8 THC advertised. Wis. Stat. § 100.18(1). This representation was untrue, deceptive, and/or misleading. The representation caused the plaintiff a pecuniary loss. Wis. Stat. § 100.18(11)(b)2 Plaintiff's inventory was seized, and his business was closed, resulting in lost profit.

**68.** Plaintiff would not have purchased these Products and would not have paid as much for these Products if the facts had been known and therefore would not have suffered damages.

**69.** The Plaintiff can meet his burden of proof in establishing myriad violations of Wisconsin law.

## COUNT II – BREACHES OF EXPRESS WARRANTY, IMPLIED WARRANTY OF MERCHANTABILITY

**70.** Plaintiff incorporates by reference all preceding paragraphs and brings this Count individually against Defendant(s).

**71.** The Product was manufactured, labeled, and/or sold by Defendant(s) and expressly and impliedly warranted to Plaintiff and others that the Products were a legal product that contained a certain amount of legal D8 THC, understood as being comprised of a legal amount of D9 THC, instead of the illegal and deficient amounts received.

**72.** Defendant manufactures, markets, and/or sells D8 THC products warranted as compliant with the Hemp Farming Act of 2018, meaning that these products contain no more than 0.3% D9 THC by weight.

**73.** Defendant made representations on the product packing, COA, and/or website that the products were legal and complied with the 2018 Hemp Farm Bill.

**74.** Plaintiff read and relied on the specific marketing statements on the label and in the COA that the Products were legal before purchasing the Products. The representations made by Defendant were patently false.

**75.** Each Defendant has a duty to disclose truthful information or provide accurate descriptions and marketing of the Products.

**76.** This duty is based on each Defendant's role in the market as a manufacturer, distributor, or tester, or retailer for this product type.

**77.** Each Defendant has previously received notice and has been aware of these issues prior to the filing of this Amended Complaint.

**78.** The Products do not conform to its affirmations of fact and promises due to Defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

**79.** Plaintiff would not have purchased the Products or paid as much for the Products if the facts had been known and, therefore, would not have suffered damages.

## COUNT III – NEGLIGENT MISREPRESENTATION

**80.** Plaintiff, incorporates by reference all preceding paragraphs against both Defendants.

81.     Defendant(s) undertook a duty to represent the Product truthfully, and Defendant breached this duty by understating the amount of D9 THC in the product and contains less than the amount of D8 THC advertised.

82.     This duty is based on each Defendant's position, holding itself out as having special knowledge and experience in this area as a manufacturer, distributor, tester, or retailer.

83.     Each Defendant's representations took advantage of consumers' cognitive shortcuts made at the point of sale and their trust in each Defendant and their products.

84.     Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce, and did induce, his purchase of the Products.

85.     Plaintiff and class members suffered injury as a result of Defendants' negligent misrepresentations and omissions, including:

   a.  Plaintiff suffered an economic loss, namely, the purchase price of the items purchased, loss of his business, and profits from his business, as the illegal nature of the products purchased rendered such products valueless;

   b.  Plaintiff was arrested and prosecuted due to his possession of the products and substances that are illegal under the CSA but were marketed by Defendants to be compliant products; and

c. Plaintiff's mental and emotional health were damaged as a result of Defendants willful negligence.

86.     Plaintiff would not have purchased the Products or paid as much for the Products if the facts had been known and, therefore, would not have suffered damages.

## COUNT IV - FRAUD

87.     Plaintiff incorporates by reference all preceding paragraphs against both Defendants.

88.     Each Defendant misrepresented and/or omitted the attributes and qualities of one or more of the Products, claiming that it was a legal product that contained D8 THC, containing less than 0.3% hemp-derived D9 THC by weight instead of an illegal amount of D9, overstating the amount of D8 THC, and otherwise inaccurately labeling one or more of the Products.

89.     Each Defendant made material misrepresentations that they knew or should have known were false by stating the Products contained the legal type and amount of D9 THC as required by the CSA and by otherwise inaccurately labeling one or more of the Products.

**90.** Each Defendant's fraudulent intent is evinced by its knowledge that the Product was inconsistent with its representations, as alleged above.

**91.** Each Defendant knowingly made these representations with the intent that Plaintiff would purchase the Products.

**92.** Plaintiff and Class members reasonably relied on these representations.

## COUNT V – UNJUST ENRICHMENT/DISGORGEMENT

**93.** Plaintiff incorporates by reference all preceding paragraphs against both Defendants.

**94.** Plaintiff unknowingly purchased and distributed illegal controlled substances manufactured by the Defendants.

**95.** Each Defendant obtained benefits and monies by selling illegal Products to Plaintiff and others.

**96.** Each Defendant knew the Products were not as represented and expected to profit from this knowledge to the detriment and impoverishment of Plaintiff, who seek restitution and disgorgement of these illegally obtained profits.

**97.** The Supreme Court has held that "if the new contract be fair and lawful, and the new consideration be valid and adequate, it will be enforced. If, however, it be unfair or fraudulent, or the new consideration so inadequate as to import fraud, imposition, or undue influence, it will be rescinded, and justice done to the parties." *Dent v. Ferguson*, 132 U.S. 50, 67, 10 S. Ct. 13, 19, 33 L. Ed. 242 (1889).

**98.** Each Defendant knew that the transaction between Defendant and Plaintiff members was illegal. Therefore, these transactions should be rescinded and the monies restored to Plaintiff

## RICO COUNTS

## COUNT I – VIOLATION OF 18 U.S.C. § 1962(C)

**99.** Plaintiff incorporates by reference the allegations of the preceding paragraphs.

**100.** Hemp businesses that market their products as medicine should be held to reasonable production standards to ensure this "medicine" is effective. But Defendants have intentionally refused to implement reasonable production standards, instead preferring to do business with crooked labs like **Marin Analytics** to provide fraudulent COAs. Plaintiff is filing this suit to vindicate his federal rights under RICO, 18 U.S.C. §§ 1961 et seq., the CSA, 21 U.S.C. §§ 801 et seq., and the Supremacy Clause.

**101.** Dealing in marijuana is racketeering activity under RICO, and those who engage in a pattern of racketeering activity through a corporation or other enterprise are liable for three times the economic harm they cause, plus costs and attorneys' fees. Plaintiff's tests revealed that the Manufacturer and Distribution Defendants routinely sell illegal D8 vape pens or concentrates (marijuana) containing distillate manufactured by entities like MC and the John Doe Distillate

makers that have been falsely labeled to the Plaintiff by failing to disclose an excessive amount of D9 THC and using distillate created by entities like MC using false lab results created by the Lab Defendants. This is the RICO enterprise. MC and the John Doe distillate makers knowingly provided cannabinoid distillate that contained excessive amounts of D9 THC to Lifted Made. Lifted Made then uses the unlawful distillate to manufacture various cannabis products that are then tested by the Lab Defendants. The Lab Defendants then produce fraudulent COAs so that Lifted Made can then distribute the noncompliant products to the Distribution Defendants or the Manufacturers ship a product that does not represent the sample tested by the Labs.

**102.** Those who conspire with racketeers by agreeing to assist them are likewise liable. Accordingly, The Plaintiff ask this Court to award him the damages, costs, and fees to which they are entitled.

**103.** The individual defendants "conduct or participate, directly or indirectly, in the conduct of the LLC's affairs. 18 U.S.C. § 1962(c). Therefore, Defendants participate in the operation or management of the enterprise, see *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), because each Defendant is an enterprise member that plays a part in conducting the enterprise's affairs. Each Defendant has contributed money and labor that furthered the pursuit of the profitable sale of illegal D8 vape pens whose D9 THC content has

been misrepresented. In particular, the enterprise is alleged to have started with the agreement of John Doe Distillate makers to ship distillate to the manufacturers that contains an illegal amount of D9 THC across state lines using the mail and wire. The Manufacturer Defendants submit orders for the illegal distillates using the mail and the internet to John Doe Distillate. The distillate is then shipped across state lines by the John Doe Distillate makers to Manufacturers who intentionally decide not to further process the distillate to remove the excess amount of D9 THC because of cost. The product is then sold to Distributors for sale to retail stores.

### Federal Law Prohibits the Manufacturing, Distribution, and Sale of Delta-9 Marijuana

**104.** Congress passed the CSA in 1970 as Title II of the Comprehensive Drug Abuse Prevention and Control Act. 84 Stat. 1236. Among the purposes of the CSA was to reduce drug abuse and the illegitimate traffic of controlled substances in the United States by prohibiting the unauthorized production, distribution, or possession of controlled substances.

**105.** When it passed the CSA, Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people," 21 U.S.C. § 801(2), and that "[a] major portion of the traffic in controlled substances flows through interstate and foreign commerce," *id.* § 801(3). The CSA seeks to address the social and economic ills

caused by drug abuse and drug trafficking by prohibiting the illicit drug trade. Defendants have conspired to import, manufacture, distribute, and possess illegal D8 THC vape pens and concentrates that are marijuana under the CSA.

106.    The CSA categorizes drugs according to a series of schedules, with the most dangerous drugs falling under Schedule I. *See id.* § 812(b). Schedule I drugs have "a high potential for abuse." *Id.* § 812(b)(1). In enacting the CSA, Congress classified marijuana as a Schedule I drug. *Id.* § 812(c). Congress thus deemed marijuana to have a high potential for abuse. *Id.* § 812(b)(1). By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, Congress made the manufacture, distribution, or possession of marijuana a criminal offense, with the sole exception being the use of the drug as part of a Food and Drug Administration pre-approved research study. *Id.* §§ 823(f), 841(a)(1), 844(a).

107.    The large-scale manufacture and distribution of marijuana is a serious felony under the CSA. A first-time offender convicted of producing or distributing 1,000 or more marijuana plants is subject to a sentence of 10 years to life imprisonment. *Id.* § 841(b)(1)(A). Growing 100 or more marijuana plants subjects the first-time offender to a sentence of 5 to 40 years imprisonment. *Id.* § 841(b)(1)(B). The distribution and sale of smaller amounts of marijuana are punishable by maximum sentences that can be as long as 20 years. *See id.* § 841(b)(1)(C), (D). The CSA also criminalizes the possession of marijuana. Unless

otherwise authorized by federal law, possession of marijuana by a first-time offender is punishable by up to 1 year of imprisonment. *Id.* § 844(a). Distillers like **MC** create distillate that is not hemp derived and contains an excessive amount of D9 THC. Distillers like MC use hemp extracts to chemically manufacture synthetic products that contain an excessive amount of D9 THC.

108. In addition to its prohibitions on the distribution, sale, and possession of marijuana, the CSA also forbids a wide range of other activities connected with the operations of a marijuana business. Thus, it is a crime to possess "any equipment, chemical, product, or material" with the intention of using it to manufacture marijuana, *id.* § 843(a)(6), or to distribute any such material with the knowledge that it will be used to manufacture marijuana, *id.* § 843(a)(7). The CSA bars the use of a telephone, email, mail, or any other "communication facility" in furtherance of the manufacture or sale of marijuana, *id.* § 843(b), and it is a federal crime to use the Internet to advertise the sale of marijuana, *id.* § 843(c)(2)(A). Reinvesting the proceeds from marijuana operations is also a crime, *id.* § 854(a), as is knowingly facilitating a financial transaction involving funds derived from manufacturing and selling marijuana, 18 U.S.C. §§ 1956, 1957, 1960. It is also a crime to knowingly lease, rent, maintain, manage, or control a place where marijuana is manufactured or sold. 21 U.S.C. § 856. Leading a group of five or more people who commit a continuing series of federal marijuana crimes is a grave offense. *Id.* § 848.

Attempting or conspiring to commit most of those crimes is also a criminal offense. *See id.* § 846; 18 U.S.C. §§ 1956(a)(1), 1956(h), 1957(a). Each of the Defendants have violated these statutes by conspiring to manufacture and distribute the Products.

109. These criminal prohibitions on virtually every aspect of the marijuana business make the federal policy embodied in the CSA unmistakably clear: marijuana is a dangerous drug that is banned throughout the United States. And because RICO defines most violations of the CSA as "racketeering activity," *see* 18 U.S.C. § 1961(1)(D), any business engaged in the manufacture and sale of Illegal D8 vape pen (marijuana) is a criminal enterprise for purposes of federal law. Those who conduct or conspire to assist such enterprises are subject to the severe criminal sanctions and civil liability RICO imposes. *See id.* § 1962(c), (d). By virtue of the facts alleged herein, Defendants are liable to the Plaintiff for the purchase price Plaintiff paid, attorney's fees he incurred, lost wages, and lost profits plus treble damages, fees, and costs.

### *The RICO Defendants Operate Racketeering Enterprises*

110. Plaintiff purchased products Defendants warranted falsely as having a certain percentage of hemp-derived D8 THC, as well as no more than .03% D9 THC by dry weight.

111. Tests of the Products purchased by the Plaintiff revealed that the Manufacturer and Distributor Defendants routinely sell illegal D8 vape pens and

concentrates (marijuana) containing distillate manufactured by entities like MC and the John Doe distillate makers that has been falsely labeled to Plaintiff by failing to disclose an excessive amount of D9 THC and using distillate created by entities like **John Doe 1** using false lab results created by the Lab Defendants. This is the RICO enterprise.

112.    Lifted Made purchased distillate from entities like **MC** and the John Doe Distillate makers. Lifted Made then used the distillate to manufacture illegal D8 vape pens and concentrates. The distillate contains more than 0.3% D9 THC by dry weight.

113.    The Lifted Made Defendants and all other Defendants sell or distribute illegal D8 vape pens and concentrates (marijuana) with different types and amounts of THC to retailers like the Plaintiff who then sell the illegal D8 vape pens and concentrates to the people like the Plaintiff. In essence, the Plaintiff and others are paying for legal hemp-derived THC but are receiving illegal marijuana, which has created millions of dollars of fraudulent profit. These actions damage Plaintiff's property.

114.    The Manufacturer and Distributor Defendants knew the Lab Defendants were misrepresenting the THC amounts because they had lab-shopped to obtain the results they were seeking. When the honest labs refused to issue false COAs, the manufacturers would not do business with them.

115.     The Manufacturer Defendants recklessly sell illegal D8 vape pens (marijuana) with different types and amounts of THC to distributors like Vando Hold LTD, who then sell the illegal D8 vape pens to individuals like Plaintiff. In essence, the Plaintiff paid for legal hemp-derived THC but received illegal marijuana, which has created fraudulent profit.  These actions damaged Plaintiff.

116.     The Lab Defendants also allow testing samples to be selected by employees whom the Manufacturer employs. This is a conflict of interest.  This conflict of interest has allowed the Manufacturer Defendants to create false test results because the samples may not represent the product sold.

117.     So, the Lab Defendants, in conspiracy with the distillate makers, manufacturers and the retailers, the individuals, and John Doe Defendants have misrepresented the amount of D9 THC in the hemp product Plaintiff brought to facilitate the sale of a controlled substance.

118.     To facilitate this fraud, the Lab Defendants knowingly created false test results that were advertised over the internet hundreds of times for publication and marketing through the wires, and such activity is wire fraud.

119.     Defendants intended that Plaintiff and others rely on these test results, and Plaintiff and others reasonably relied on the test results to their detriment.

120.     The Labs understated the amount and type of D9 THC contained in the marijuana by 2200% in some cases.

121.    Leasing or maintaining property for the sale and distribution of marijuana is a crime under 21 U.S.C. § 856 and is racketeering activity under 18 U.S.C. § 1961(1)(D).  The Manufacturer and Retailer Defendants have leased or maintained property for the sale and distribution of illegal D8 vape pens and concentrates (marijuana.)

122.    Defendants, together with their respective accountants, law firms, payment processors, payment equipment companies, and bankers, sued as John Does 20-100, also conspired and agreed to work together so that the Defendants could sell D8 vape pens and concentrates (marijuana) as legal hemp-derived THC and contribute to the ongoing violations of the CSA inherent in those operations. Entering such an agreement is conspiracy under 21 U.S.C.§ 846 and racketeering activity under 18 U.S.C. § 1961(1)(D).

123.    Each Defendant used the telephone, email, internet, or other communication facilities to take steps in furtherance of their efforts to sell D8 vape pens and concentrates that had been mislabeled hundreds of times unlawfully. Such uses of communication facilities violate 21 U.S.C. § 843(b) and are racketeering activity under 18 U.S.C. § 1961(1)(D).

124.    Aided by the other Defendants, the retailer and the Manufacturer Defendants advertise illegal D8 vape pens and concentrates (marijuana) for sale and

their services over the Internet in violation of 21 U.S.C. § 843(c)(2)(A) in interstate commerce, and this is racketeering activity under 18 U.S.C.§ 1961(1)(D).

125.     The John Doe Manufacturer and Lab Defendants together formed an open-ended association-in-fact enterprise for the purpose of selling illegal D8 vape pens and concentrates (marijuana) across the United States and selling it to retailers across the nation for purchase by the Plaintiff. To that end, they pooled their resources, knowledge, skills, and labor to achieve through the enterprise efficiencies in the manufacture, sale, and distribution of marijuana that none of them could have achieved individually.

126.     All of the RICO defendants and John Doe Defendants have contractual and other relationships with each other, and they are collaborating to contribute to the association-in-fact enterprise's efforts to sell marijuana and thereby engage in an ongoing pattern of racketeering activity.

127.     All of the RICO defendants agreed to participate in and assist the enterprise with full knowledge of its overall aim of manufacturing and selling illegal D8 vape pens and concentrates  (marijuana). As stated above, that goal could only be accomplished through numerous CSA violations and wire fraud violations. Each such violation of the CSA is a racketeering activity, and all of the RICO defendants thus knew and intended that in agreeing to assist the enterprise, they would help it carry out a pattern of racketeering activity.

**Plaintiff is damaged in his property and liberty.**

**128.**     Plaintiff bought what they believed to be a legal hemp-derived D8 THC product, but the Products sold were illegal.

**129.**     In fact, Plaintiff purchased marijuana tested, manufactured, and marketed by Defendants as having specific percentages of D9 THC. However, third-party lab testing results showed that the level of D9 THC far exceeded the limit of 0.3% D9 THC by dry weight.

**130.**     Plaintiff, believing that the D8 product was hemp and accurately labeled, used the labels to determine which products to purchase and sell to the customers of his business because he did not want to break the law.

**131.**     Plaintiff's counsel has had the illegal D8 vape pens and concentrates tested at another lab. The tests revealed that product labels using Defendants test results significantly understated THC content.

**132.**     Because the Plaintiff, believing the misrepresentations of the Defendants regarding the legality of the Products marketed to the Plaintiff by the Defendants, purchased the Products marketed to the Plaintiff by the Defendants, the Plaintiff was arrested, criminally prosecuted by the State of Arkansas, deprived of his property and his business, which constituted his livelihood, and was convicted of a crime for which the Plaintiff was fined.

**133.** RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Defendants each violated this provision of 18 U.S.C. § 1962.

**134.** RICO provides, inter alia, "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1962(c). "Any person injured in his business or property by reason of a violation" of this or the other substantive provisions of section 1962 "may sue therefore in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Thus, to establish his RICO claims, Hooks must prove "(1) that the defendant violated § 1962; (2) that the plaintiff's business or property was injured; and (3) that the defendant's violation is the cause of that injury." *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017). Regarding the first element of that test, a violation of section 1962(c) of RICO requires proof that defendants "(1)

conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering

activity." Id. at 882 (citation and internal quotation marks omitted).

135.    An "enterprise" under RICO "includes any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals

associated in fact. This definition encompasses informal associations and formal

legal entities, and Plaintiff alleges both types of enterprises. Together with their

respective John Does and members, each corporate entity, like Lifted Made

Defendants, and other named Defendants manufactures D8 vape pens or

concentrates with distillate from entities like **John Does 1-10**, then sells marijuana

is an enterprise because there is no dispute that each corporation is a "legal entity"

and thus may constitute a RICO "enterprise." See *Cedric Kushner Promotions, Ltd.*

*v. King*, 533 U.S. 158, 163, 121 S.Ct. 2087, 2091, 150 L.Ed.2d 198 (2001) An

association-in-fact enterprise is a group of persons associated together for a common

purpose of engaging in a course of conduct. Such an entity "need not have a

hierarchical structure or a 'chain of command. . .. . For it to exist requires only a

purpose, relationships among those associated with the enterprise, and longevity

sufficient to permit these associates to pursue the enterprise's purpose. *Safe Streets*,

859 F.3d at 882-83 (citations and internal quotation marks omitted).

136.    Defendants test, manufacture, and sell the illegal D8 vape pens and

concentrates (marijuana) and therefore formed an association-in-fact enterprise

within the meaning of 18 U.S.C. § 1961(4) by establishing contractual and other relationships with other entities like, distributors, hired private accountants, private lawyers, payment processors, banks, and Real Estate Holding companies that own the facilities that manufacture the illegal D8 vape pens or concentrates, collaborating to develop D8 vape pens and concentrates to sell, all named as John Does. Distillers like MC and the John Doe Distillate makers create distillate that is not hemp-derived and contains an excessive amount of D9 THC. This enterprise enables the RICO Defendants to achieve their collective purpose more efficiently.

137.     Funding, goods, and services procured by the enterprise have moved into interstate commerce, and the enterprise has transported marijuana in interstate commerce. The enterprises alleged herein affect interstate commerce. See *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090, 2106, 195 L.Ed.2d 476 (2016). See also *Russell v. United States*, 471 U.S. 858, 859, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (noting term "affecting interstate or foreign commerce" conveys Congress's intent to exert its full power under the Commerce Clause). The Tenth Circuit has determined as much already. Safe Streets, 859 F.3d at 883 ("Cultivating, distributing, and selling marijuana . . . undisputedly affects interstate commerce.").

138.     The Manufacturing Defendants purchase distillate from entities like **John Does 1-10**, who then used the distillate to manufacture illegal D8 vape pens

and concentrates. The distillate always contains more than .3% D9 THC, by dry weight.

**139.** Defendants, their respective officers, directors, and John Does have each conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity. "Racketeering activity" under RICO consists of "dozens of state and federal offenses, known in RICO parlance as predicates," including most specifically for present purposes, "any offense involving . . . a drug-related activity that is 'punishable' under federal law." *RJR Nabisco*, 136 S.Ct. at 2096. As the Tenth Circuit determined, "cultivating marijuana for sale . . . is by definition racketeering activity." *Safe Streets Alliance*, 859 F.3d at 882. See 18 U.S.C. § 1961(1)(D) (racketeering activity includes "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance"). See also 21 U.S.C. § 802(16) (classifying marijuana as a controlled substance under the CSA). The Defendants' Directors, and their officers, in association with each other, their respective banks, accountants, lawyers, and suppliers, entered into an agreement under which Defendants will commit numerous crimes under the CSA, and that agreement violates 21 U.S.C. § 856. They also conspired, in violation of 21 U.S.C. § 846, to work together with the rest of the enterprise for the success of the manufacturer Defendant's open-ended illegal D8 vape pens and concentrates (marijuana) business.

**140.** On information and belief, the Manufacturer and Distribution Defendants used wire communication facilities to sell the marijuana and their drug conspiracy in violation of 21 U.S.C. § 843(b).

**141.** Defendants possess materials, goods, and facilities for the manufacture of marijuana in violation of 21 U.S.C. § 843(a)(6) obtained in interstate commerce and continue to purchase distillate, solvents and other chemicals necessary to manufacture and test illegal D8 vape pens and concentrates (marijuana). All of those crimes are racketeering activity under 18 U.S.C. § 1961(1)(D).

**142.** Defendants have engaged in a "pattern" of racketeering activity established by proof of "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco*, 136 S.Ct. at 2096-97.11 "It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle," as well as the actuality or threat of continued criminal activity, which establishes the necessary pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238-39, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).12 "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id., 109 S.Ct. at 2901 (citation and internal quotation marks omitted). Continuity may be shown where "the predicates are a regular way of

conducting defendant's ongoing legitimate business[.]" Id. at 2902. Both of these elements are satisfied factually in this case. Defendants have manufactured and sold illegal D8 vape pens and concentrates continuously since at least 2019.

143. Each act of advertisement, email solicitation, and sale constitutes a separate violation of the CSA and wire fraud and, therefore, a predicate RICO offense. These acts are related to one another in type and purpose. Moreover, Defendants' manufacture and sale of marijuana is their "regular way of doing business."

144. The racketeering activities of Defendants directly and proximately injured the Plaintiff's property by selling them illegal marijuana using the wires, email, and the US Mail. The websites operated by the Defendants are:

a. Lifted Made dba Lifted liquids: https://urb.shop/

b. MC Nutraceuticals: https://mcnutraceuticals.com/

145. Each solicitation for the sale of illegal D8 vape pens and concentrates is a separate predicate offense. Racketeering activities undertaken by the Defendants have injured the Plaintiff property by selling them legal hemp that was actually illegal marijuana.

146. The racketeering activities of Defendants directly and proximately injured Plaintiff's property by selling them D8 products that contained illegal amounts of D9 THC. Defendants misrepresented THC values for commercial gain

and to mislead Plaintiff, who could not know what was truly in the product. Thus, Plaintiff entitled to recission and a disgorgement of the purchase price.

147. Plaintiff has been damaged in his property because his conviction has caused him to lose wages. Plaintiff has expended attorney's fees in defending the criminal charges, lost inventory, and lost profits because he was compelled to close his store. Plaintiff has also been damaged in his property by being defrauded of the purchase price and therefore seek treble damages, fees, and costs.

## COUNT II - Violation of 18 U.S.C. § 1962(d)

### *Against All RICO Defendants*

148. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

149. RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C.§ 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Plaintiff has been damaged in his property by virtue of the Defendants' sale and distribution of illegal D8 vape pens and concentrates with the assistance and knowing involvement of Lab Defendants, where the Defendants, through one or more of their respective members, requested, and the Labs agreed to understate THC values and

conceal harmful substances in the marijuana. This enterprise was aided and abetted by the other Defendants.

150.    The Defendants, for their mutual and individual profit, agreed and conspired with each other and their respective John Does to violate 18 U.S.C. § 1962(c) by forming an association-in-fact enterprise for the purpose of selling illegal D8 vape pens and concentrates (marijuana) across the US and selling it throughout the US, after testing with the Lab Defendants who agreed to provide false THC values and conceal harmful substance in the marijuana. The RICO Defendants knew that this was patently unlawful under the CSA. This scheme could only be accomplished through a pattern of racketeering activity, for maintaining premises at which marijuana is manufactured and sold, manufactured and selling marijuana, testing the marijuana, and possessing the goods and materials needed to manufacture and sell illegal D8 vape pens and concentrates (marijuana) are all crimes under the CSA. *See, e.g.*, 21 U.S.C. §§ 841(a), 843(a)(6), 856.

151.    Funding, goods, and services procured by the Defendants in furtherance of their association-in-fact enterprise with each other and the respective John Doe Defendants. to manufacture illegal D8 vape pens and concentrates (marijuana) have moved in interstate commerce, and the enterprise plans to sell marijuana across the US that affects interstate commerce.

152.     The Defendants have engaged in racketeering activity in furtherance of their conspiracy to violate 18 U.S.C. § 1962(c). All of the RICO Defendants violated 21 U.S.C. § 846 by agreeing and conspiring to assist in the establishment of each Manufacturer Defendant's creation, distribution, and sale of illegal D8 vape pens and concentrates. Defendants and their agents entered into an agreement to sell marijuana and test marijuana in violation of 21 U.S.C. § 856.

153.     Racketeering activities undertaken in furtherance of the RICO Defendants' conspiracy to violate 18 U.S.C. § 1962(c) have injured the Plaintiff's property by selling them illegal marijuana represented as legal hemp.

154.     The racketeering activities of Defendants directly and proximately injured the Plaintiff's property by selling them illegal D8 vape pens and concentrates, Defendants misrepresented THC values for commercial gain and to mislead Plaintiff and others, who could not know what was truly in the product. Plaintiff has been damaged in his property by being defrauded of the purchase price and therefore seek treble damages, fees, and costs.

155.     The individual Defendants "conduct or participate, directly or indirectly, in the conduct of the LLC's affairs.  18 U.S.C. § 1962(c). Therefore, Defendants participate in the operation or management of the enterprise, see *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), because each Defendant is an enterprise member that plays a part in conducting the

enterprise's affairs. Each Defendant has contributed money and labor that furthered the pursuit of the profitable sale of marijuana whose THC content has been misrepresented.

      **WHEREFORE**, Plaintiff, **JESSE HOOKS,** prays for judgment;

    **a.** awarding appropriate compensatory and punitive damages exceeding one million dollars;

    **b.** Injunctive relief to remove, correct, and/or refrain from the challenged practices and representations, and restitution and disgorgement pursuant to the applicable laws;

    **c.** Awarding monetary damages pursuant to any statutory claims and interest in accordance with the common law and other statutory claims;

    **d.** Awarding costs and expenses, including reasonable attorneys' fees for Plaintiff's attorneys and experts;

    **e.** Declaratory Judgment that the products Plaintiff purchased contained more than .3% D9 THC by dry weight and was a Controlled Substance;

    **f.** Declaratory Judgment that the products Plaintiff purchased contained less than the amount D8 THC advertised;

    **g.** Treble or double damages;

    **h.** Disgorgement or recission; and

    **i.** Any other and further relief as the Court deems just and proper.

Respectfully submitted,


**SUTTER & GILLHAM, P.L.L.C**.
Attorneys at Law
1501 N. Pierce Ste 105.
Little Rock, Arkansas 72207
501/315-1910  Office
501/315-1916  Facsimile
Attorneys for the Plaintiff

By:    */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Esq., ARBN 95-031
        luther.sutterlaw@gmail.com