# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

JESSIE HOOKS                                        **PLAINTIFF**

      **v.**                       **Case No. 2:24-cv-00209-PP**

**LIFTED MADE D/B/A LIFTED LIQUIDS;**
**LFTD PARTNERS, INC.; URB CANNABIS;**
**and, AND JOHN DOES 1-10**                      **DEFENDANTS**

---

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff, **JESSIE HOOKS,** by and through counsel, **SUTTER & GILHAM, P.L.L.C.**; and, for this Complaint, Plaintiff alleges:

## INTRODUCTION

1.      Plaintiff, **JESSIE HOOKS**, is a resident of the State of Arkansas who purchased delta-8 ("D8") vape pens (the "Products").

2.      The Products were manufactured, distributed, and/or sold by Defendant(s).

3.      Plaintiff purchased Products manufactured, distributed, tested, and/or sold by Defendant(s) that contained a concentration of more than 0.3 percent on a dry weight basis of delta-9 ("D9") THC. Plaintiff intended to purchase the Products labeled as D8 vape pens but was sold vape pens containing a concentration of more than 0.3 percent on a dry weight basis of D9 THC.

4.      Plaintiff was arrested and convicted of a crime, which proximately caused him to lose profits and wages and the loss of his business, which sold the Products. He was not guilty of the crime he was originally charged with, but he was guilty of a crime because he had purchased the Defendant's products.

5.      The Controlled Substances Act of 1970 prohibits the manufacture, distribution, and

sale of cannabis products with a delta-9 ("D9") tetrahydrocannabinol ("THC") concentration of more than 0.3 percent on a dry weight basis.

<u>**JURISDICTION AND VENUE**</u>

6.  Subject Matter Jurisdiction is proper under 28 U.S.C. § 1332, 28 USC 1331, and 28 USC 1334, since no Defendant is a resident and citizen of Arkansas.

7.  The aggregate amount in controversy exceeds $75,000, including any statutory damages, exclusive of interest and costs.

8.  Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district. More specifically, Defendants manufactured, distributed, and/or sold the Products in this district.

9.  Plaintiff purchased the Products manufactured, distributed, and/or sold by Defendants in the four years preceding the filing of the Original Complaint.

<u>**PARTIES**</u>

10. Plaintiff, **JESSIE HOOKS**, is a resident and citizen of the State of Arkansas.

11. Publicly-traded LFTD Partners Inc., Jacksonville, FL (OTCQB ticker symbol LIFD) is the parent corporation of Lifted Made, Kenosha, WI (**www.LiftedMade.com**), which manufactures and sells psychedelic products under its Silly Shruum brand, and hemp-derived cannabinoid products under its Urb Finest Flowers brand. On February 24, 2020, LIFD acquired 100% of the ownership interests in one Canna-Infused Products Company called Lifted Liquids, Inc. d/b/a Lifted Made and d/b/a Urb Finest Flowers (www.urb.shop), Kenosha, Wisconsin ("Lifted Made" or "Lifted"). Lifted primarily manufactures and sells hemp-derived and psychoactive products under its award-winning Urb Finest Flowers ("Urb") brand. Products currently sold by Lifted under its Urb brand include, for example, vapes and cartridges, gummies,

joints, and blunts. LFTD Partners Inc. is a Nevada corporation ("LIFD"), and Lifted Liquids, Inc. is an Illinois corporation ("Lifted"). However, Warrender has publicly stated that URB is owned by a small, publicly-traded company called LFTD Partners, which is traded on the OTC under the ticker LIFD. LFTD went public in 2020 and is a wholly owned subsidiary. The manufacturing subsidiary is called Lifted Made, based out of Kenosha, Wisconsin; it has three facilities in Wisconsin of about 50,000 square feet in total, and one facility in Durango, Colorado, employing over 100 employees. Defendants claim they do all of their manufacturing in-house, but it is believed that they purchase distillate from a John Doe. Defendants know it is important to control the supply chain, so they have invested a substantial amount of time, effort, and money into building out infrastructure in Kenosha. So, Defendant, LIFTED MADE d/b/a LIFTED LIQUIDS, has a primary business address in Kenosha, Wisconsin, is a resident and citizen of Wisconsin, and advertises an Illinois hemp license #1204-291. Defendant, LIFTED LIQUIDS, has corporate filings in the following states: CA, CO, FL, GA, IL, IN, KY, LA, MD, MN, MS, NJ, NC, OH, TX, VA, VT, and may be registered in other states. Lifted Liquids' Registered Agent is Corporate Creations Network Inc., located at 4640 Admiralty Way FL5, Marina Del Rey, CA 90292. It is believed that the individual Defendants are residents and citizens of Florida. John Does 1-10 are entities who are not residents and citizens of Arkansas who have provided LIFTED MADE with distillate containing an illegal amount of synthetic THC. LIFTED MADE d/b/a LIFTED LIQUIDS is the parent company of URB CANNABIS.

12. The John Doe Defendants 1-10 are presently unidentified individuals or entities who supplied, manufactured, transported, or assisted in the sale of the illegal distillate used in Defendants' products. These unknown parties are believed to have knowingly provided delta-8 THC distillate containing illegal levels of delta-9 THC or otherwise participated in the fraudulent

scheme by or facilitating the sale and distribution of misbranded THC products. Upon information and belief, none of the John Doe Defendants are residents or citizens of the State of Arkansas. Plaintiff reserves the right to amend this Complaint to identify these Defendants as their identities become known through discovery.

<u>**GENERAL ALLEGATIONS OF FACT**</u>
<u>**INTRODUCTION**</u>

13.     This case presents a significant issue of public health and consumer deception. Defendants knowingly and falsely represented to consumers that the delta-8 ("D8") vape pens they manufactured and sold were legal under federal and state law, explicitly claiming these products contain no more than 0.3% delta-9 ("D9") tetrahydrocannabinol ("THC") in compliance with the Agricultural Improvement Act of 2018, Pub. L. No. 115-334, § 12619, and the Controlled Substances Act, 21 U.S.C. § 802(16)(B). These representations were not only false but were made with the intent to deceive and mislead consumers into purchasing products that were, in fact, illegal and unsafe.

14.     Delta-8 THC, scientifically known as delta-8-tetrahydrocannabinol, is a cannabis compound that has gained popularity due to its similarity to delta-9 THC, the primary psychoactive compound in cannabis responsible for euphoria, relaxation, and sedation. Delta-8 THC is often referred to as "D-8" and can produce effects similar to those of delta-9 THC, though typically less potent at comparable concentrations.

15.     Delta-8 THC occurs naturally in both marijuana and hemp, but its presence is minimal, requiring substantial amounts of plant material to extract significant quantities. As a result, delta-8 THC is typically synthesized. Like delta-9 THC, delta-8 THC binds to the body's endocannabinoid system, producing psychoactive effects. Chemically, delta-8 and delta-9 THC are similar, featuring a double bond in their molecular structures. The distinction lies in the position

of the double bond: delta-8 has it on the eighth carbon atom, while delta-9 has it on the ninth carbon atom.

16.     Due to the position of its double bond, delta-8 THC binds to the endocannabinoid system differently, making it less potent than delta-9 THC. To obtain delta-8 THC in sufficient concentrations for vaping and to produce a "high," manufacturers illegally synthesize delta-9 THC in amounts exceeding legal limits.

17.     Under the Hemp Farming Act of 2018 and the corresponding United States Farm Bill, products containing more than 0.3% delta-9 THC on a dry weight basis are unequivocally classified as marijuana and remain illegal under both federal and state law. The Defendants' products, including those purchased by the Plaintiff, flagrantly violate these legal standards, rendering their sale and distribution illegal under the Controlled Substances Act of 1970 ("CSA") and the Arkansas Hemp Production Act of 2021 (A.C.A. § 2-15-501 et seq.).

18.     The hemp plant is cultivated, then its leaves and other parts are processed to create distillate. The distillate is then synthesized to create high levels of delta-8 and delta-9 THC. However, the delta-9 cannabinoid in the resulting product is not adequately removed by the distiller due to the associated costs. Accordingly, all of these vape devices contain an illegal amount of D9 THC. Thus, the vape pens contain marijuana, a Schedule I controlled substance.

19.     A Certificate of Analysis ("COA") is a detailed document issued by a third-party laboratory that verifies the contents and quality of a hemp product. It ensures compliance with legal standards and provides transparency to consumers. Critically, the COA confirms that the delta-9 THC content does not exceed the 0.3% limit mandated by the 2018 Hemp Farm Bill Act. However, the COAs obtained by the Defendants were false and inaccurately warranted that the products were legal and compliant with federal law.

20.     Scientists will testify that the liquid in the vape devices, commonly referred to as vape oil, is shelf-stable, meaning that the delta-9 THC cannabinoid levels measured by independent laboratories remain consistent from the time of testing to the time the product was packaged by manufacturers, such as Defendants, and sold to distributors and retailers for resale to consumers. Moreover, the vape oil in these devices is not derived from natural agricultural processes but is instead a synthetic product. The delta-9 THC cannabinoid in the vape oil is artificially synthesized through a manufacturing process, highlighting its synthetic and unlawful nature.

## PLAINTIFF HAS BEEN DAMAGED

21.     Plaintiff owned a retail establishment in Arkansas that sold hemp and glass products.

22.     Nicholas S. Warrender is a corporate officer in all of the Defendants who has personally engaged in the fraud alleged herein. Their admissions bind the Defendants who conspired to engage in a joint venture designed to sell marijuana.

23.     Plaintiff Jessie Hooks purchased at least $3,253.00 of URB-branded products manufactured by Lifted Made in reliance upon the specific guarantees on the product's website and packaging, as alleged in paragraphs 29-32. Law enforcement seized thousands of dollars of Plaintiff's inventory.  Defendants falsely certified these products did not violate the CSA. Therefore, Plaintiff unknowingly bought illegal products manufactured by the Defendants.  Law enforcement seized two full cases and thirteen loose packs of Urb rocks made up of the flavors Blue Razz and Strawberry Lemonade, Eleven boxes of Urb gummies and one loose blister pack; the strain names are Blood Orange, Kiwi Mixer, Two, urb, vegan gummy packs with the strain name of Birthday Cake, Two plastic bottles of delta 9 Lemon Gummies, Five urb brand, THC-O,

Cupcake Kush, vapes, Eight urb vape pens, strain names of Zenergy Uplift and small box vape pens, and one container of a crumble concentrate.

24.    The invoices in Plaintiff's possession, along with the purchase date for each order and the prices listed on the invoices, are attached as Exhibit "A."

25.    For the invoice dated February 4, 2022:

- Urb THC-O Disposable | 2g – Goji Gelato

- Urb THC-O Disposable | 2g – Cupcake Kush

26.    For the invoice dated February 18, 2022, the following URB-branded products were purchased:

- URB Extrax Delta 9 Gummies | 10 count – Guavaberry Fruit

- URB Extrax Delta 9 Gummies | 10 count – Blood Orange

- URB Extrax Delta 9 Gummies | 10 count – Pomegranate Breeze

- URB Extrax Delta 9 Gummies | 10 count – Blueberry Citrus Burst

27.    For the invoice dated April 13, 2022, the following URB-branded products were purchased:

- URB Live Resin THC-O Cartridge | 1 Gram – Blue Watermelon Indica

- Urb Delta 9 THC Gummies | 25 count – DragonFruit Paradise

28.    For the invoice dated April 29, 2022, the following URB-branded products were purchased:

- Urb THC Infinity Disposable Vape | 2g – Gas Berry (Hybrid)

- Urb THC Infinity Disposable Vape | 2g – Strawberry Cereal (Indica)

- Urb THC Infinity Disposable Vape | 2g – Tropical Mango (Sativa)

- URB Extrax Delta 9 Gummies | 10 count – Blood Orange

- URB Extrax Delta 9 Gummies | 10 count – Peach Mango

**DEFENDANTS' FALSE STATEMENTS AND ITS CONSEQUENCES**

**29.** Each Urb vape pen product falsely states, "Compliant Hemp-derived Distillate, Oleorisin, Terpenes" See Exhibit "B." The distillate is neither compliant nor hemp-derived. Had Plaintiff known the truth, he would not have purchased Defendant's product. Nicholas S. Warrender, Vice Chairman and COO of LFTD Partners, and founder and CEO of Lifted Made. In 2021, Warrender, speaking within his express and apparent authority on behalf of the corporate Defendants, falsely claimed, "Regardless of the cannabinoid of your choice, all of LiftedMade's products come with thorough lab tests that prove not just the potency but also the purity and healthfulness of what you purchase."

**30.** Each Urb product falsely states on the product's packaging, "Lifted Made does not manufacture, sell, or distribute any products that violate the United States Controlled Substances Act(US CSA)." However, these products violate the CSA because the THC is either not hemp-derived or contains more D9 THC than .3% D9 THC. Had Plaintiff known the truth, he would not have purchased Defendant's product.

**31.** Each EXTRAX vape pen product Defendants manufactured falsely states on the product's packaging, "Lifted Made/Delta Effex does not manufacture, sell, or distribute any products that are in violation of the United States Controlled Substances Act(US CSA). However, these products violate the CSA because the THC is either not hemp-derived or contains more D9 THC than .3% D9 THC. Had Plaintiff known the truth, he would not have purchased Defendant's product.

**32.** Each EXTRAX gummie product Defendants manufactured falsely states on the product's packaging, "Lifted Made/Delta FX does not manufacture, sell, or distribute any products

that are in violation of the United States Controlled Substances Act(US CSA). However, these products violate the CSA because the THC is either not hemp-derived or contains more D9 THC than .3% D9 THC. Had Plaintiff known the truth, he would not have purchased Defendant's product.

33.     Local law enforcement raided Plaintiff's store and seized the merchandise Plaintiff had purchased that Lifted Made had manufactured, as well as cash and other inventory. Plaintiff does not believe any of Defendants' products were tested by law enforcement. The products that were tested by law enforcement were not tested in accordance with generally accepted scientific principles such that Plaintiff and his counsel fully expected that those test results would be thrown out as unreliable under Daubert.

34.     Plaintiff was arrested and charged with a crime, and his store was also closed. Plaintiff was aware that the evidence would show that he was, in fact, guilty of a felony by virtue of his possession of the products the Defendants manufactured. So, after disclosing this to the Prosecutor, as required by the Arkansas Drug Dealer Act, he elected to plead nolo contendere to a misdemeanor because he possessed the Defendants' products, albeit unknowingly.

35.     As a result, Plaintiff lost all of his inventory, as well as lost profits.

36.     Plaintiff Jessie Hooks had purchased products manufactured by Defendant Lifted Made that made false statements, as shown in Exhibit "C."

## DEFENDANTS HAVE A HISTORY OF USING FALSE COAS

37.     Indeed, the individual Defendants knew that the product contained more than .3% D9 THC by dry weight because they specifically hired a lab that agreed to understate the amount of D9 THC in the product.

38.     Before the filing of this lawsuit, the individual Defendants were aware that other

labs had tested their D8 vape pen products and reported that the D8 vape pens contained more than .3% D9 THC.

39. Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories – both are Wisconsin-based, accredited testing laboratories that perform cannabinoid profile testing who sued Lifted Liquids, Inc. (a company based in Illinois) and Nicholas Warrender, who is identified as the CEO and was previously associated with a Wisconsin corporation, Warrender Enterprise, Inc.

40. Lifted Liquids, Inc. and Nicholas Warrender were accused of violating the Lanham Act (15 U.S.C. § 1125(a)) by making literally false or misleading statements in their advertising of CBD products, placing deceptive and misleading statements before the public and improperly using Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories' identifying information (including their name, logo, and employee signature) without permission, in violation of relevant Wisconsin statutes.

41. Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories alleged that between August and September 2019, Lifted submitted over forty product samples to Accelerated Cannabis for cannabinoid profile testing.

42. Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories issued Certificates of Analysis (COAs) for these tests. The COAs accurately detailed the products' cannabinoid content (including CBD and THC).

43. Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories alleged that Defendants later altered at least 24 of these COAs ("Altered COAs") and fabricated additional COAs ("Fabricated COAs") to misrepresent the CBD content and, in one instance, to understate the THC content (notably on a product labeled "Stormy Daniels Flower").

44. Accelerated Analytical, Inc. and Accelerated Cannabis Laboratories alleged that

these alterations were done intentionally to make the test results appear to match the advertised claims, deceiving consumers about the true cannabinoid makeup of the products—and, in the case of THC levels, potentially resulting in the sale of a Schedule I substance.

45.     Defendants then lab-shopped until they found a lab that would falsely certify compliance with the Farm Bill, as exemplified by an email string produced by Dr. Andrea Holmes, a cannabis testing expert, attached as Exhibit D.

46.     Indeed, Defendants were notified that their products were not in compliance with the Farm Bill in the email string attached as Exhibit D. Yet, they continued to sell their illegal products, which eventually resulted in other retailers being raided.

47.     In Ohio, a chain of shops called VIP Smoke Shop (operated by two brothers) was the target of a 20-month law enforcement investigation culminating in raids and indictments in 2024. One VIP location in Centerville, OH, was raided in April 2023, and additional enforcement actions followed.

48.     By October 2024, Ohio's Attorney General obtained indictments against the owners, alleging they trafficked illegal cannabis products under the guise of hemp. In total, the two brothers were hit with 60 criminal counts related to their stores' sales.

49.     Investigators say they tested dozens of delta-8 vape cartridges from VIP and found many exceeded the D9 THC limit. The Urb products purchased from VIP locations in 2024 by Johnny Crawford were not compliant with the Farm Bill. Law enforcement believes VIP was selling what amounted to marijuana vapes while exploiting the "hemp" label. Concerns about sales to minors also fueled the probe – local officials noted that teenagers frequented VIP for these products (Ohio had no age-restriction law for hemp cannabinoids at the time)

50.     Further, the media reported that state and local authorities have targeted delta-8

THC products, including those sold under the Urb brand, citing safety and compliance issues. Many states have passed laws or advisories restricting delta-8, and enforcement is on the rise. For instance, in Montgomery County, Pennsylvania (Feb 2023) – the District Attorney issued an urgent warning after two people overdosed on purported delta-8 gummies. Investigators found that certain "CBD"/THC edibles sold at local Tobacco Hut shops were tainted with fentanyl and heroin. Among the products identified were "Urb Extrax" gummies, as well as "Strictly Delta – Happy Cubes" and "Packwoods Coned" edibles. Testing confirmed that the Urb Extrax gummies contained fentanyl, posing a deadly risk. DA Kevin Steele publicly urged consumers to stop using Urb Extrax or similar unregulated THC candies immediately, and authorities seized those products from store shelves.  Yet Defendants have continued to sell illegal products.

51. Defendants did not have COAs for each product posted on their website.  Exhibit I was posted as representative of all the vape pens.  In fact, Defendants tested less than 1/ 2 of their products or at least did not make test results available on their website.  Thus, Defendants knowingly manufactured a product using a uniform process using distillate that contained more than .3% D9 THC by dry weight or that contained THC that was not hemp-derived.  This created products that were in violation of the CSA. The products are manufactured, sold, and supply chain are described in Exhibit "E.""

52. In order to induce Plaintiff's reliance, Defendants published the statements attached as Exhibit "F."

53. In order to induce Plaintiff's reliance, Defendants knowingly published the false statements attached as Exhibits "G" and "H," as well those contained in paragraphs 29-32. Thus, Defendants knowingly encouraged consumers like Plaintiff to rely upon their fraudulent COAs.

54. Of the 4 urb products that tested hot, only one had a COA - Cupcake Kush THCO.

See Exhibit I. As alleged above, Defendant represented this COA, as being representative of its entire vape product line. That COA was produced by Marin Analytics in California. Marin Analytics is not licensed by the State of California to test cannabis or hemp, and no federal agency licensing was ever granted to it. Additionally, Marin Analytics is not an accredited lab by any outside organization. So, the only COA published by Lifted Made for its D8 vape pen products is for the Cupcake Kush vape, ostensibly because a uniform process described in Exhibit "E" is utilized. See Exhibit I. Marin Analytics, the lab that issued the COA, is not licensed to test these products and is not accredited by any independent organization to test them either.

55. Despite knowing that his products were noncompliant, Warrender has continued to claim in 2024 that "We were one of the first brands to launch true compliant Delta-8 products. We were the first brand to launch a compliant Delta-9 only edible product." Warrender's statement is false. Exhibit J contains accurate information about the products at issue that violate the CSA.

## DEFENDANTS KNOWINGLY VIOLATE FDA REGULATIONS AND WISCONSIN LAW

56. D9 THC is the psychoactive component of what is commonly known as marijuana. The vape products at issue are not food. Both the vapes and the gummies are marketed for their psychoactive effect- not their nutritional value. The vapes are Schedule I drugs under Wisconsin and federal law. Mr. Warrender is well aware of the psychoactive effects and markets their psychoactive effects. Its website states:

### Warning Statement

- This product is intended for use by adults 21 years and older keep out of reach of children.

- There may be health risks associated with the consumption of this product.

- There may be additional health risks associated with the consumption of

this product for women who are pregnant, breastfeeding, or plan to become

pregnant.

- The intoxicating effects of this product maybe delayed by two or more

  hours.

- Do not drive a motor vehicle or operate machinery while using this product.

- Use of this product may result in a positive drug screen.

- Contains: THC

**57.**     Defendants have marketed their products as "energy-rich," "focus-based," and

"ideal for use during the day."  Others are marketed as " helping the user relax" and "better for

users at night and for calming effect." Thus, these products are marketed for their psychoactive

effects.

**58.**     Warrender's company has said it receives updates from its <u>attorneys</u>, saying some

products can't be sold in some 15 states, with some states increasingly looking to age-restrict or

ban products containing Delta-8.  So, Plaintiff alleges that Defendants are well aware that the FDA

has concluded that products labeled "Delta 8 THC Distillate Oil," "Delta 8 THC Vape Cartridge,"

"Delta 8 THC Disposable Vape Pen,"  "Delta 8 THC Tincture," "Delta 8 Infused Gummies," and

"Delta 8 Infused Sour Gummies" (hereinafter referred to as "Delta-8 THC products for humans"),

are unapproved new drugs sold in violation of sections 505(a) and 301(d) of the Federal Food,

Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 355(a) and 331(d).  Furthermore, these products

Plaintiff purchased are misbranded drugs under section 502(f)(1) of the FD&C Act, 21 U.S.C.

352(f)(1).  No reasonable lawyer would approve such labeling.

**59.**     Defendants are well aware that the FDA has concluded that products labeled as

"Delta 8 Infused Gummies" and "Delta 8 Infused Sour Gummies" products are adulterated under

section 402(a)(2)(C)(i) of the FD&C Act, 21 U.S.C. 342(a)(2)(C)(i), because they bear or contain an unsafe food additive.

60. Defendants are well aware that the FDA has concluded that introducing or delivering these products for introduction into interstate commerce violates the FD&C Act.

61. Specific information about how the FDA regulates cannabis-derived products can be found at https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd.

62. Indeed, the FDA has warned the public about various illegally marketed CBD-containing products. FDA has said it has also observed a proliferation of products containing another cannabinoid, Delta-8 THC, and has expressed serious concerns about products containing Delta-8 THC that include: 1) Delta-8 THC products have not been evaluated or approved by FDA for safe use and may be marketed in ways that put the public health at risk; 2) FDA has received adverse event reports involving Delta-8 THC containing products; 3) Delta-8 THC has psychoactive and intoxicating effects; 4) FDA is concerned about the processes used to create the concentrations of Delta-8 THC claimed in the marketplace; and 5) FDA is concerned about Delta-8 THC products that may be consumed by children, as some packaging and labeling may appeal to children. See https://www.fda.gov/consumers/consumer-updates/5-things-know-about-delta-8-tetrahydrocannabinol-delta-8-thc.

63. Further, Defendants's products at issue are misbranded within the meaning of section 502(f)(1) of the FD&C Act, 21 U.S.C. 352(f)(1), in that their labeling fails to bear adequate directions for use. "Adequate directions for use" means directions under which a layperson can use a drug safely and for the purposes for which it is intended. (See 21 CFR 201.5.) Defendants have offered its Delta-8 THC products for conditions that are not amenable to self-diagnosis and

treatment by individuals who are not medical practitioners. Therefore, adequate directions for use cannot be written so that a layperson can use these drugs safely for their intended purposes. Under 21 CFR 201.100(c)(2) and 201.115, FDA-approved prescription drugs that bear their FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson. However, Defendants' products are not exempt from the requirement that their labeling bear adequate directions for use because no FDA-approved applications are in effect for Defendants' products. Thus, Defendants' introduction or delivery for introduction into interstate commerce of misbranded drugs violates section 301(a) of the FD&C Act, 21 U.S.C. 331(a).

64.     Defendants' Delta 8 Infused Gummies, as opposed to the vape pens Plaintiff purchased, may be foods, as defined by federal law, to which Delta-8 THC has been added.

65.     As defined in section 201(s) of the FD&C Act, 21 U.S.C. 321(s), the term "food additive" refers to any substance the intended use of which results in its becoming a component of any food, unless the substance is generally recognized as safe (GRAS) among qualified experts under the conditions of its intended use, or unless the substance meets a listed exception. Food additives require

66.     Defendants did not obtain premarket approval based on data demonstrating safety. Any food additive that has not been approved for its intended use in food is deemed to be unsafe under section 409(a) of the FD&C Act, 21 U.S.C. 348(a), and causes the food to be adulterated under section 402(a)(2)(C)(i) of the FD&C Act, 21 U.S.C. 342(a)(2)(C)(i). Introduction of an adulterated food into interstate commerce is prohibited under section 301(a) of the FD&C Act, 21 U.S.C. 331(a).

67.     There is no food additive regulation that authorizes the use of Delta-8 THC. There is no information to indicate that Delta-8 THC is the subject of a prior sanction (see 21 CFR Part

181). There is no basis to conclude that Delta-8 THC is GRAS for use in conventional foods. FDA's regulations in 21 CFR 170.30(a)-(c) describe the criteria for eligibility for classification of a food ingredient as GRAS. The use of a food substance may be GRAS based on either scientific procedures or, for a substance used in food before 1958, through experience based on common use in food (see 21 CFR 170.30).

68. There is no general recognition of safety for Delta-8 THC based either on scientific procedures or common use in food prior to January 1, 1958. Based on its review of published scientific literature, existing data, and information, the FDA has concluded that there is no adequate basis for concluding that the use of Delta-8 THC in food meets the criteria for GRAS status. Some of the available data raise serious concerns about potential harm from Delta-8 THC. The FDA's review of published scientific literature identified potential for adverse effects on the central nervous and cardiopulmonary systems. In addition, studies in animals have suggested that gestational exposure to Delta-8 THC can interfere with neurodevelopment. Therefore, the FDA concluded that the use of Delta-8 THC in the products does not satisfy the criteria for GRAS status under 21 CFR 170.30.

69. The FDA has said it is not aware of any other exception to the food additive definition that would apply to Delta-8 THC for use as an ingredient in a conventional food. Therefore, Delta-8 THC added to a conventional food is a food additive under section 201(s) of the FD&C Act and is subject to the provisions of section 409 of the FD&C Act. Under section 409, a food additive is deemed unsafe unless it is approved by FDA for its intended use prior to marketing. Delta-8 THC is not approved for use in any conventional food. Food containing an unsafe food additive within the meaning of section 409 is adulterated within the meaning of section 402(a)(2)(C)(i) of the FD&C Act.

70. Therefore, Defendants' Delta 8 Infused Gummies are adulterated within the meaning of section 402(a)(2)(C)(i) of the FD&C Act because they bear or contain an unsafe food additive. Introduction of these adulterated foods into interstate commerce is prohibited under section 301(a) of the FD&C Act, 21 U.S.C. 331(a). And Defendants know it.

## WARRENDER MARKETS THE PRODUCT AS A DRUG

71. Warrender is aware people using Delta-8-THC can experience a rapid change in mood. Warrender has said, "It doesn't have the anxiety typically associated with [Delta-9]-THC; it doesn't have the head fog or the paranoia, the couch-lock comedown. It's a very clean and euphoric feeling, but it doesn't take you out of your mind or out of the present, and [it allows] you to be productive and proactive throughout the day."

72. Whenever Warrender wants to take a "miniature vacation," he'll take a draw from his disposable, Delta-8 vape device. "It's like a refresh button," he says. "It helps me focus. It helps me feel refreshed. It helps me stay [focused on] singular tasks and focused on what needs to be done right now, rather than getting overwhelmed."

73. Warrender has said that hemp-derived products containing the cannabinoid CBD can be sold as long as they have no more than 0.3 percent Delta-9-THC — the primary constituent within recreational cannabis products that gives them their psychoactive effects.

74. Warrender has stated that Delta-8 distillate is produced from CBD oil, using a process Warrender calls "forced conversion" — a laboratory technique that transforms CBD into Delta-8-THC. Thus, Defendants know the products Hooks has purchased contain THC that is not hemp-derived and therefore illegal.

75. In 2021, Warrender falsely stated in a published interview that Lifted Made's Delta-8 hemp-derived products meet the legal limit for Delta-9-THC. He stated that Lifted Made buys

its Delta-8-THC distillate from third-party labs, which it then infuses into the majority of its products in Kenosha.

76.     Delta-8 is applied to the hemp flower via a "proprietary spraying process," says Warrender. But this "Delta 8" is not hemp-derived.

77.     Further, in response to the Oregon Liquor Control Commission, which oversees that state's cannabis regulation, expressed concern about purity in a recent statement, Warrender, in 2021, pointed to the lab testing results on his company's website. "All of our products are free of any residual solvent, any heavy metals, any pesticides," says Warrender. "We do very rigorous testing to assure that there's nothing residual in there from the [Delta-8 production] process." This is false

78.     Warrender's selling of Delta-8 products and his highlighting of the cannabinoid's "euphoric" qualities —put him at odds with a group like the U.S. Hemp Roundtable, which has said it's "opposed to marketing products under the guise of the hemp name, for any intoxicating value or euphoric effect." But that is precisely what he does.

79.     Warrender has said he sees it differently. "I think in the hemp industry, we ought to be coming together to explore all the different cannabinoids and what those effects can be for what [peoples'] needs are," he counters. "The way these products affect each individual is different." In other words, what makes one person feel euphoric might not affect someone else the same way while potentially providing wellness or cognitive benefits.  Thus, Warrender appears to market the product as a drug.

Each product Hooks purchased is a "drug" as defined by section 201(g)(1)(B) of the FD&C Act [21 U.S.C. 321(g)(1)(B)] because it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, and/or under section 201(g)(1)(C) of the FD&C Act [21 U.S.C.

321(g)(1)(C)], because it is intended to affect the structure or any function of the body.

**PLAINTIFF UNKNOWINGLY PURCHASED A CONTROLLED SUBSTANCE**

80.     In reasonable reliance upon Defendants' misrepresentations in paragraphs 29-32 and Exhibits F, G, and H, Plaintiff purchased these Products anticipating and expecting them to be legal D8 THC products because the Products were warranted to contain less than .3% D9 THC by dry weight. As a proximate cause of his purchases, Plaintiff was arrested and had to plead guilty.

81.     Plaintiff wanted a legal amount of hemp-derived delta-9 tetrahydrocannabinol (hereinafter "hemp-derived D9 THC").   Plaintiff did not purchase a product containing a legal amount of Delta 9 Tetrahydrocannabinol because of each Defendant's deception.

82.     Unbeknownst to Plaintiff, the Products labeled as "D8" contained an illegal amount of D9 THC and an understated amount of D8 THC.

83.     Plaintiff purchased numerous Products sold by Defendants to market to the public through his business. In doing so, Plaintiff relied upon the Exhibit I placed upon the Products by Defendants, indicating that the Products had been tested and were in compliance with federal law.

84.     Lifted Made d/b/a Lifted Liquids were and are knowingly falsifying information on their product containers, misleading consumers with false COA information like Exhibit I, and colluding with laboratories to obtain D9 results that falsify the accurate amount of the D9 cannabinoid that is in their products.

85.     Lifted Made d/b/a Lifted Liquids warrants that these D8 THC Vape Pens, on the label and through fraudulent certificates of analysis, are compliant with the Hemp Farming Act of 2018, meaning that these products are to contain no more than 0.3% hemp-derived D9 THC by weight.  This representation is false because the Products contained more than 0.3% hemp-derived D9 THC by weight and understated the amount of D8 THC.

86. Each Defendant intended for Plaintiff to rely upon these false representations because Defendant also warrants and represents through its website:

> "We know that having certified, third-party lab results is what's important for you to trust your favorite hemp-derived products. That's why we send every product we make for testing of various things."

87. In 2021, Warrender claimed that regardless of the cannabinoid a consumer chooses, all of LiftedMade's products come with thorough lab tests that prove not just the potency but also the purity and healthfulness of what you purchase. This was false. Further, Defendants refuse to implement a proper 3rd party compliance program in accordance with ISO 1765, and they refuse to ring test their products.1

88. The representations made by Defendants are misleading because the product label and the COA like Exhibit I warrants that each product contains a legal amount of D9 THC even though they do not.

89. The Products are manufactured, distributed, or sold individually by each Defendant, and each Defendant has continuously manufactured, distributed, and/or sold illegal products for over a year, according to Plaintiff's product testing results.

90. Plaintiff relied on the representations on the label that the products Plaintiff bought contained a legal amount or type of Delta 9 Tetrahydrocannabinol.

91. Plaintiff would not have purchased any of the Products if Plaintiff knew that the representations that the Products purchased contained a legal amount of Delta 9 Tetrahydrocannabinol on the label were false and misleading.

92. Plaintiff chose the Products over similarly situated and represented products that contained a legal amount and type of Delta 9 Tetrahydrocannabinol.

---

1 A ring test is where three labs test the same product and compare the test results.

93. The Products were illegal and worthless because they did not contain a legal amount of Delta 9 Tetrahydrocannabinol and an understated amount of D8 THC. No business owner who wished to remain in business would have purchased the Products absent the Defendants' false and misleading statements and omissions.

94. Plaintiff intends to, seeks to and will purchase D8 products again if and when Plaintiff can do so with the assurance that Product representations that the product contains a legal amount and type of Delta 9 Tetrahydrocannabinol are legal and truthful.

95. As used in this Complaint, an illegal D8 THC vape means a vape that contains more than 0.3% D9 THC hemp-derived THC by weight or an understated amount of D8 THC.

96. Each of the Products referenced a COA, and but these COAs like Exhibit I did not reveal that it contained more than .3% d9 THC by dry weight.

97. Each of the Products was tested by Certified , which indicated that they had a specific amount of THC. Exhibit J. The testing also revealed the presence of an understated amount of D8 THC in each product.  The testing of the Products, which occurred on or about November 3rd, 2023, showed the following retested hemp-derived D9 variance levels **of** strain names of Cupcake Kush THCO, Zenergy Uplift, and Crumble, respectively, ReTest D9 THC 6.96%, 5.82%, and .0992% respectively, with D9% variance of 2220.%, 1840%, and 230.6666667%, respectively, above the legal limit; as well as brand name Gummies, with Strain Name Lemon Gummies, ReTest D9 THC 0.325%, with D9% variance of 8.333333333% above the legal limit. See Exhibit J.

## THIS IS AN ILLEGAL PRACTICE WELL KNOWN TO THE DEFENDANTS

98. After they were caught using fake COAs, Defendants purposefully began sending their products for testing to a laboratory, specifically Pharmlabs and Marin Analytics.

99. Pharmlabs publishes its test results stating that it cannot determine the amount of

D9 THC present in the products it tests. It advises its customers, like the Defendants, that its test results cannot be used to certify compliance with the Farm Bill or the CSA. Contrary to its test report statements, Pharmlabs has been accredited for being able to identify and quantify D9 THC in hemp-related products.

100.     Other laboratories, such as KCA, Infinite Chemical Analysis and Certified, have no problem accurately identifying and quantifying D8 THC and D9 THC in hemp-related concentrates. Further, Defendants use Infinite Chemical Analysis and KCA for other types of testing but do not regularly use them for potency testing, which identifies and quantifies cannabinoids.

101.     But Defendants use Marin Analytics in California for the testing of the products because other laboratories like ICA will not. Further, Marin Analytics is not licensed by the state of California or any accrediting agency for laboratory testing of cannabinoids.  Thus, Defendants knowingly used labs they knew would produce false test results.

## COUNT I- FRAUD

102.     Plaintiff incorporates by reference all preceding paragraphs against both Defendants.

103.     The manufacturing, distribution, and sale of Products with more than 0.3% D9 THC by weight is illegal.  Plaintiff purchased the Products, set out hereinabove, that contained more than 0.3% D9 THC by weight or synthetic THC.

104.     The Products that Plaintiff purchased were worth zero because the Products were illegal under the federal CSA, Arkansas Law, and Wisconsin law.  But Plaintiff paid the full price for a legal product.

105.     Defendants sold the Products at higher prices than they would have in the absence

of this misconduct, resulting in additional and illegal profits at the expense of consumers.

106.    Had Plaintiff known the truth, he would not have bought the Products because they are illegal.

107.    Each representation in paragraphs 29-32 and Exhibits F, G, and H were untrue, deceptive, or misleading.

108.    Defendants have made a representation of fact to the plaintiff through their false product labeling and website.

109.    Plaintiff believed and relied on the misrepresentation contained in paragraphs 29-32 and Exhibits F, G, and H to his detriment or damage."

110.    As alleged above, Defendants made each misrepresentation in paragraphs 29-32 and Exhibits F, G, and H with the knowledge that it was false or recklessly without caring whether it was true or false.

111.    Defendants made the misrepresentations in paragraphs 29-32 and Exhibits F, G, and H with intent to deceive and to induce the plaintiff to act on it to his detriment or damage.

112.    Indeed, Defendants had a duty to disclose because Defendant told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression, and he does so." If a party has a duty to disclose a fact, "[t]he failure to disclose [that] fact constitutes a misrepresentation." *Hennig v. Ahearn*, 230 Wis. 2d 149, 601 N.W.2d 14, 22 (Wis. Ct. App. 1999). Each Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was a legal product that contained D8 THC, containing less than .3% hemp-derived D9 THC by weight, instead of an illegal amount of D9 THC.

113.    Each Defendant's fraudulent intent is evidenced by its knowledge that the Product was inconsistent with its representations and its efforts to lab shop and publish False COAs over

the internet. Defendants' intentional conduct is such that punitive damages should be awarded.

114. In sum, Defendants knowingly engaged in a pattern of fraudulent misrepresentation by falsely labeling and marketing their products as compliant with federal law, despite clear evidence that they contained illegal levels of delta-9 THC. Defendants intentionally misrepresented their products on both the packaging and website, explicitly stating they contained no more than 0.3% delta-9 THC, when in reality, independent lab testing confirmed otherwise. Plaintiff relied on these statements and purchased products on multiple occasions, including February 4, 2022; February 18, 2022; April 13, 2022; and April 29, 2022, for resale in his business. Defendants falsified Certificates of Analysis (COA) like Exhibit I and engaged in "lab shopping" to obtain misleading test results that concealed the true THC levels in their products.

115. As a result of the misrepresentations in paragraphs 29-32 and Exhibits F, G, and H, Plaintiff was forced to close his business, suffering significant financial and reputational harm. The fraudulent conduct was not an isolated mistake but a deliberate scheme designed to mislead consumers and maximize profit at the expense of lawful business owners like Plaintiff. Accordingly, Plaintiff is entitled to compensatory and punitive damages to hold Defendants accountable for their intentional misconduct.

## COUNT II – WISCONSIN 100.18 and 100.20(5)

116. Plaintiff incorporates by reference all preceding paragraphs against Defendants.

117. There are federal and identical state regulations requiring that a product's front label disclose what is in the product and prohibit unsafe drugs and additives from being marketed. Further, In Wisconsin, Wis. Stat. Ann. § 961.41 makes possession of the product illegal because each product is marijuana or contains an illegal amount of synthetic cannabinoid. Defendants' labeling was deceptive, confusing, or misleading because Plaintiff and any reasonable consumer

could believe, based on the false representation in paragraphs 29-32 above, that the product was not in violation of the CSA. But it was, and Defendants knew it was.

118. The Fraudulent Representations Law (Wisconsin Statutes section 100.18) broadly prohibits advertising or sales claims that are "untrue, deceptive or misleading." The Act "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements." *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, 270 Wis. 2d 146, 677 N.W.2d 233, 244 (Wis. 2004). The vape products at issue are clearly not food, and neither are the gummies within the meaning of Wisconsin 100.183 because the gummies are not articles used for food or drink by persons or Chewing gum.

119. The Unfair Business Practices Law (Wisconsin Statutes section 100.20) authorizes DATCP to prohibit "unfair" business practices (and prescribe fair practices) by rule or order. § 100.20(5) bars unfair trade practices. Wis. Admin. Code ATCP § 90.02 (Lexis Advance through Wis. Admn. Register No. 829B, January 27, 2025) states:

> No person may sell or distribute a consumer commodity in package form unless each package clearly and conspicuously identifies the commodity contained in that package. The declaration shall identify the commodity by its common or usual name, by its legally required name, if any, or by a generic name or other appropriate description that is readily understood by consumers.

And Wis. Admin. Code ATCP § 90.01 (Lexis Advance through Wis. Admn. Register No. 829B, January 27, 2025) states that:

> The gummies and the vape pens are each a "Consumer commodity" because the gummies and vape pens are:
> **(a)** ……
> **(b)** A drug as defined under 21 USC 321 (g) (1), except biological animal products, antibiotics, drugs dispensed by prescription, and drugs containing insulin.
> **(c)** …………
> **(d)** …………
> **(e)** An article, product, or commodity that is all of the following:
> **1.** Customarily produced and distributed for retail sale to consumers.

**2.** Used by consumers for purposes of consumption, personal care, or the performance of household tasks.
**3.** In the process of use by consumers, is normally fully consumed or expended.
**Note**: An illustrative list of commodities included or excluded under par. (e) is available from the department. The list is based on interpretations made by the Federal Trade Commission under 16 CFR 503.2 and 503.5 pursuant to the Federal Fair Packaging and Labeling Act, 15 USC 1451 to 1461.

Thus, vape pens and gummies are consumer commodities.

120.    Thus, the manufacture, delivery, and advertisement of the products Hooks purchased are unfair trade practices. Reasonable consumers rely on a company to honestly identify and describe a product's components, attributes and features relative to itself and other comparable products or alternatives.

121.    Defendants gained an advantage over other companies and against consumers seeking legal products. In fact, the consumers were purchasing products of lower value than the Defendant represented —in fact, the products were worth zero.

122.    Thus, Defendants sold more of the product at a higher price than it would have "in the absence of this misconduct," and that consumers would not have bought the product because it is illegal under state and federal law, as alleged above.

123.    Reasonable consumers, like Plaintiff, rely on a company to honestly identify and describe the Product's components, attributes and features relative to itself and other comparable products or alternatives.

124.    As alleged above, Defendants made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff."

125.    Indeed, as evidenced by the product pictures herein, the label is likely to mislead a reasonable consumer, even if the statement is literally true." *Suchanek v. Sturm Foods, Inc.*, 764

F.3d 750, 761-62 (7th Cir. 2014).

126. Plaintiff desired to purchase a legal product that contained hemp-derived D8 THC, understood as being comprised of a non-de minimis legal amount of D9 THC derived from hemp; instead, the Products contain an illegal amount of hemp-derived D9 THC. Honest testing can, and has, differentiated between hemp-derived Delta 9 THC and synthetic THC. But Defendants have intentionally refused to use honest labs.

127. Defendant manufactured, tested, or sold has made false and misleading advertising claims purporting to be based on factual, objective evidence in the form of scientific test results. See Exhibit I.

128. In conspiracy with testing labs, the John Does, and its John Doe distillate manufacturer, Defendant made false and misleading claims regarding the Product through statements, omissions, ambiguities, half-truths, and/or actions that the product contained less than 0.3% D9 THC by weight and contained less than the amount of advertised D8 THC.

129. Defendants violated Wis. Stat. §100.18 and 100.20 with the intent to induce an obligation, the defendant made a representation to "the public." that the product did not violate the CSA, i.e. contained less than 0.3% D9 THC by weight and contained less than the amount of D8 THC advertised. Wis. Stat. § 100.18(1). Indeed, such advertising is an unfair trade practice and designed to mislead consumers like the Plaintiff.

130. Each representation in paragraphs 29-32 and Exhibits F, G, and H were untrue, deceptive, or misleading. The representation caused the plaintiff a pecuniary loss. Wis. Stat. § 100.18(11)(b)2 because Plaintiff has lost reputation, been defrauded of the purchase price, lost profits, lost inventory, incurred thousands of dollars in fees for his criminal defense lawyer, paid thousands of dollars of sales tax on the illegal product,

**131.** Plaintiff would not have purchased these Products and would not have paid as much for these Products if the facts had been known and therefore would not have suffered damages.

**132.** In sum, Defendants engaged in false, deceptive, and misleading advertising in violation of Wis. Stat. §§ 100.18 & 100.20, by knowingly misrepresenting that their products complied with the CSA, i.e. contained no more than 0.3% delta-9 THC, when in fact, independent testing showed otherwise. See Exhibit J.

**133.** As alleged in paragraphs 29-32 and Exhibits F, G, and H Defendants made public representations through product packaging, website statements, and Certificates of Analysis (COAs), fraudulently warranting their products as legal under the 2018 Farm Bill and the Controlled Substances Act. Plaintiff relied on these misrepresentations and purchased products for resale on February 4, 2022; February 18, 2022; April 13, 2022; and April 29, 2022, believing them to be legal. As a direct result, Plaintiff's store was raided, inventory was seized, and he was prosecuted, suffering severe financial losses and reputational harm. Defendants gained an unfair business advantage over competitors by deceiving the public and selling illegal substances under false pretenses. Their conduct constitutes fraudulent representation under Wis. Stat. § 100.18 and an unfair trade practice under Wis. Stat. § 100.20. Accordingly, Plaintiff seeks damages, restitution, and all available statutory remedies to hold Defendants accountable for their deceptive business practices.

## DAMAGES

As a proximate cause of Defendant's fraudulent statements and violation of Wisconsin state law, Plaintiff has lost reputation, been defrauded of the purchase price, lost profits, lost inventory, incurred thousands of dollars in fees for his criminal defense lawyer, paid thousands of dollars of

sales tax on the illegal product, incurred mental health expense, has been depressed, and suffered severe mental and emotional distress.

WHEREFORE, Plaintiff, **JESSIE HOOKS,** prays for judgment;

a. Awarding monetary pursuant to any statutory claims and interest in accordance with the common law and other statutory claims;

b. Awarding costs and expenses, including reasonable attorneys' fees for Plaintiff's attorneys and experts;

c. Declaratory Judgment that the products Plaintiff purchased contained more than .3% D9 THC by weight;

d. Declaratory Judgment that the products Plaintiff purchased contained less than the amount D8 THC advertised;

e. Awarding Plaintiff compensatory damages and punitive damages in excess of $100,000.00;

f. Double damages plus fees and costs; and

g. Any other and further relief as the Court deems just and proper.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C**.
Attorneys at Law
1501 N. Pierce Ste 105.
Little Rock, Arkansas 72207
501/315-1910 Office
501/315-1916 Facsimile
Attorneys for the Plaintiff

By:     */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Esq., ARBN 95-031
luther.sutterlaw@gmail.com